*227-15*

ORIGINAL

IN THE TEXAS COURT OF CRIMINAL APPEALS

RECEIVED IN
COURT OF CRIMINAL APPEALS
MAY 06 2015
Abel Acosta, Clerk

Quentin Washington

vs

The State of Texas

FILED IN
COURT OF CRIMINAL APPEALS

MAY 06 2015

Abel Acosta, Clerk

In Re: No. 02-13-00526-CR

In the Second Ditrict Court

of Appeals

Fort Worth, Texas

Applicant's Petition for Discretionary
Review in Accordance with T.R.A.P. 68

To the Honorable Court of Appeal:

Now comes, Quentin Washington, the Appellant in the appeal, pursuant to Rule 68, of Tex. R. App. Proc. submits this PDR for the purpose of appealing his conviction and sentence in the trial court of the 211th District Court of Denton County under cause No. F-2012-2475-C, and the Second District Court of Appeals February 5, 2015 Memorandum Opinion.

Appellant seeks review of the February 5, 2015 Memorandum Opinion, which affirmed the trial court's judgment in reference to Appellant's two points of error, which consisted of:

(1) The trial court erred by admitting the printout from a cell phone extraction device without establishing the reliability of the scientific theory underlying the device and without establishing the reliability of the testing procedures and qualifications of the operator.

(2) It was error to admit the chlamydia test results of Appellant because the State failed to prove a proper chain of custody or that the urine tested was Appellant's uring.

In reference to Appellant's point of error one in style Quentin Washington v. The State of Texas No. 02-13-00526-CR (Tex. Crim. Appeals Feb. 5, 2015). The State reviewed Appellant's error for an abuse of discretion in the light of Sanders v. State 422 S.W. 3d. 809, 812 Tex. App. Fort Worth 2014 pet. ref'd, which states an abuse of discretion occurs when a trial court's decision is so clearly wrong as to lie outside the zone of reasonable disagreement Id at 812-13.

1.

Near the beginning of the trial, outside of the presence of the jury, the trial court held an evidentiary hearing on the admissibility of records from the extraction of mother's cellphone Shawn Dority, a detective with the Lewisville Police Department (:OD), testified that he performs approximately two cellphone extractions per month, had been doing so for about a year and a half, and had received training in extractions through a twenty-hour course. He testified that he had extracted mother's cellphone in August 2012 by connecting the phone to a "piece of computer equipmant that took the data on the cellphone and copied it over to another location.

Specifically, Detective Dority testified that the LPD used a "UFED" cellebrite device to extract data from cellphones. The device comes with a large amount of different cables for each, kind of cellphone," and the person extracting data selects the model of phone on a list after connecting the device. Detective Dority explained that he knew the phone in question had been successfully extracted because the UFED cellebrite stated that extraction had occured and output a report to a memory stick. He also testified that the UFED cellebrite does not allow a user to alter extracted information from the phone. Detective Dority identified State's Exhibit 1-A printout of text messages exchanged between two hone numbers as the data extracted from mother's phone. On cross examination, Detective Dority admitted that he didn't know what the letters in UFED represented, that he did not know technological details about how the UFED or cellphones worked, that the UFED and cellphone in question has not been tested on the day of hte extraction to determine that they were working properly, and that there was no way to conclusively determine that any particular person sent a text message from a cellphone number that appeared on the report.

This court went on to state that in applying the controlling principle of reliability to the particular circumstances of this case. We do not opine about the general reliability of cellphone extractions, on the particular reliability of an extraction through a UFED cellebrite, or on the type or extent of testimony required for admission of cellphone extraction report when they are not independently corroborated by the owner or possessor of the cellphone in question. We cannot hold that the trial court abused its discretion by admitting the cellphone extraction report because the combination of the officer''s testimony with mother's and Rita's uncontroverted testimony empirically showed that the extractions accurately copied and displayed text-message exchanges from mother's and Rita'a phones. Before the trial court admitted State's Exhibit (1A0 detective Dority testified that he had received training in cellphone extractions and had completed many extractions that he knew the extraction was successful because of the information produced by the UFED

cellebrite. Mother then conformed that State's Exhibit 1A - comprising a small part of the lengthy extraction report-matched text message exchanges between her and Appellant that were taken from her cellphone.

For the reason asserted in QUENTIN WASHINGTON V. THE STATE OF TEXAS (Nos. 02-13-00526-CR) (Tex. Crim. App. February 5, 2015) shown above which rest on the authority set in Sanders v. State 422 S.W. 3d. at 812; Tex.App-Fort Worth 2014). Appellate disagree with the findings that the court did not abuse its discretion and also assert that such findings is unreasonable in light of the fcts and testimony of detective Dority who admitted that he did not know what the letters in "UFED" represented, that he did not know technological details about how the UFED or cellphones worked, that the UFED and cellphone in question had not been tested on the day of the extraction to determine tha they were working properly, and that there was no way to conclusively determine that any particular person sent a text message from a cellphone number that appeared on the report which a Supreme Court, in Daubert v. Merrell Dow Pharmaceuticals Inc. who stated that Article VII of the Federal Rules of Evid.had superseded the Frye test, which had stood for (70) years 509 U.S. 579, 587-89 (1993). Although the Supreme Court in Daubert jettisoned the old Frye test, it did impose a requirement that the trial judge must act as a gatekeeper under Rule 702 and 104(A) to ensure the reliability of scientific evidence Daubert 509 U.S. at 589-90. The Supreme Court held taht when the subject of the expert's testimony is scientific knowledge, the basis for the testimony must be grounded in accepted scientific methods and procedures The Court explained:

> To qualify as scientific knowledge, an inference or assertion must be drprived by the scientific method. Proposed testimony must be supported by appropriate validation, good grounds, based on what is known. In short the requirement taht an expert's testimony pertain to scientific knowledge establihsed a standard of evidentiary reliability Id. at 590.

The court listed; as general observation, following four nonexclusive factors for trial judges to use in assisting them to determine scientific reliability of the lying theory and methodology: (1) the testability of the proffered theory (2) its submission to peer review and publication (3) the error rate of its application and (4) its level of general aceptance within the relevant scientific community. the court emphasized that the gatekeeping inquiry is flexible and focuses on the scientific validity and thus the evidentiary revelance oand reliability of the principles and methodology of the particular expertise offered. The trial judge scrutizes only the scientific theory and methology, the validity of the expert's secific conclusion are for the jury to assess, aided by cross-examination.

3.

Even before the Daubert decision, the Texas Court of Appeals had announced and implemented a similar gatekeeping rule for trial judges in evaluating the reliability of scientific expertise offered in criminal cases in Kelley v. State 824 S.W. 2d. 568 (Tex. Crim. App. 1992) a case involving the admissibility of DNA genetic fingerpringing evidence, the court explicitly rejected the Frye test and held taht the admissibility of novel scientific evidence is governed by Rule 702 and 403. See bethune v. State 828 S.W. 2d. 14, (Tex. Crim. App. 1992). To prevent the admission of "junk science" in the courtroom however, the court adopted several procedural and substantive limitations under Kelley, a trial judge must first determine whether scientific evidence is suffficiently reliable, and relevant, to help the jury in reaching an accurate result.

Applicant asserts that based on the facts in which the State lies on the testimony of detective Dority who testified that there was no way to conclusively determine that any particular person sent a text m easage from a cellphone number that appeared on the report, which the State could rely on any text message on the sheet and lead the jury to belive that such text is related to the case in which Applicant was on trial with no way for Applicant to rebutt without taking the stand. He also admitted taht he did not know what the letters in UFED represented and that he did not know technological detail about the UFED or cellphes worked, prejurying himself at one point, by stating that the UFED does not allow a user to alter extracted information from the phone, and least but last he stated that the UFED and cellphone in question has not been tested on the day of the extractioo to determine that they was working properly.

Therefore, making it almost impossible for this court to side with the court on the no abuse of discretion, when the Judge only scrutinizes the scientific theory and methology, the validity of the expert's specific conclusions which are for the jury to assess, aided by cross-examination in regards to acting as a gatekeeper. When such scientific reliability lack knowledge, such as what detective Dority acknowledged, in his predicate expertise testimony, contrary to the gate-keeping machanism set out in Dabeizt v. Merrell Dow Pharm. Inc. 509 U.S. 579 (1993); E.I. du pont de nemours & Co. v. Robinson v. State 923 S.W. 2d. 549, 554 (Tex. 1995) and Kelly v. State 824 S.W. 2d. 568 (Tex. Rule of Evid. (702) & (104) states that in order to qualify as scientific knowledge, and in referrence or assertion must be driven by the scientific method, proposed testimony must be supported by appropriate validation good grounds, based on what is known. In short the requirement that the expert's testimony pertain to scientfic knowledge established a standard of evidentiary reliability Id. at 590. Which detective Dority's qualifications don't meet.

4.

Applicant further asserts that the State should not be allowed to circumvent the standards set out in Daubert, because the defendant elects not to testify therefore unable to rebutt any text message presented before the court which prejudiced Applicant deadly in the light of facts stated by detective Dority who stated that there was no way to tell who texts was on the printout sheet.

## IN REGARDS TO ERROR TWO

In error two Applicant alleged that it was error to admit the chlamydia test results of Appellant because the State failed to prove a proper chain of custody or that the urine tested was Appellant's urine which the second Dist. Court of Appeals in Fort Worth in style QUENTIN WASHINGTON v. The State of Texas under cause No. 02-13-00526-CR (Tex. Crim. App. Feb. 5, 2015) at 12-15) asserted:

Because we conclude that the evidence sufficiently estaglishes the beginning and end of the chain of custody of Appellant's urine sample and that there is no affirmative evidence of tampering or alteration, we hold that the trial court did not abuse its discretion by admitting results of the urinalysis Patel, 2009 WL 1425219 at 2-3; Dossett v. State 216. S.W. 3d. 7, 17 Tex. app. – San Antonio (2006) we overrule Appellant's second point which Appellant argues that the conclusino by the Second Court ofAppeals os imreasonable based on the facts before the 211th District Court. Which reflect the testimony of Appellant who denied taht the urine sample was his because he had sex with Arie Hopkins and she did not contact chlamydia. He said had he had that STD that she would have contracted it as well. Therefore the urine sample submitted was erroneously identified as his. Appellate asserts that Appellant's assertion clearly surrounds allegation of tampering in the denial of the urine sample being the ones that was retrieved from him therefore supporting the standards set out in Druery v. State 225 S.W. 3d. at 503, and argues that such error should have been granted.

## CONCLUSION

Applicant asked that relief be granted due to the State failing to keep the gateway to admissibility in regards to the text messages and the test results of the unknown urine sample due to there being a wide break in the chain of custody in violation of both the Tex. R. Evid (104) & (702).

5.

PRAYER

Applicant pray taht the Honorable court will review Applicant's P.D.R. consider all the facts, arguments and contentions and thereafter grant Applicant due relief.

UNSWORN DECLARATION

I, Quentin Washington TDCJ-ID #~~1893202~~, being presenty incarcerated in the Texas Department of Criminal Justice in Jones County, Texas: declare under penalty of perjury that the foregoing is true and correct:

Executed on this day, *MAY 4th 2015*

*Washington #1893202*
Quentin Washington
TDCJ-ID
French Robertson Unit
12071 FM 3522
Abilene, Texas 79601

Civil practice and remedies code title 6, Chapter 123 V.T.C.A.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00526-CR

QUENTIN WASHINGTON                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. F-2012-2475-C

----------

## MEMORANDUM OPINION[1]

----------

Appellant Quentin Washington appeals his convictions for five counts of aggravated sexual assault.[2] In two points, he contends that the trial court erred by admitting printouts generated by a cell-phone extraction device and by

----

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii), (2)(B) (West Supp. 2014).

admitting urine-test results showing that he had a sexually-transmitted disease. We affirm.

## Background Facts

A.H. (Mother) moved with her children, including her daughter R.A. (Rita), to Lewisville in 2010.[3] Upon arriving there, Mother met appellant. At first, Mother believed that appellant was a "great guy"; she and the children were living on tight finances, and he helped her pay for food and transportation. Later, appellant allowed Mother and the children to move in with him. He drove a tow truck to make money, and Mother and the children sometimes went with him on jobs. Mother believed that Rita considered appellant to be a father figure.

In 2012, appellant occasionally stayed at his house with the children when Mother, who was a nurse, went to work. One day in August 2012, when Rita was thirteen years old, appellant spoke with Mother about a "new little girl" that Rita knew. Concerned that Rita was having a sexual relationship with the girl, Mother spoke to Rita but "wasn't convinced" about Rita's explanation of the relationship. Thus, Mother took Rita's cell phone (which appellant had bought for her) and began to read text messages that it contained. Upon doing so, Mother saw graphic text messages between appellant and Rita that indicated they were having sex.

---

[3]To protect the complainant's anonymity, we will use initials and aliases to refer to her and to her mother. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

2.

When Mother confronted appellant through a text message about having sex with Rita, he texted back to Mother that he was sorry and asked for forgiveness. Appellant never denied in his subsequent text messages that he had engaged in a sexual relationship with Rita; instead, he repeatedly apologized, expressed his desire to "fix it," and implored Mother to not call the police. Appellant also stated in a text message that if Mother "call[ed] the laws," he would turn himself in. He recognized in a text message that he "might get like 20 years."

In response to Mother's questioning, Rita initially denied having sex with appellant because she did not want him to go to jail. Later, she admitted to having sex with him twice. Mother did not believe Rita's statement that the sex had only occurred twice. Mother called the police about the sexual assaults.

By appellant's prompting, Rita told the police that she had been a willing participant in having sex with appellant and asked the police not to "take him." Mother believed that Rita was trying to protect appellant. Eventually, Rita participated in a forensic interview. She also saw a sexual assault nurse examiner. She told the nurse examiner that multiple sexual assaults had occurred. Appellant went to Port Arthur, and Mother and the children continued to stay in his house for several months.

The police arrested appellant while he was living near Houston. A grand jury indicted him with five counts of aggravated sexual assault against Rita. Before trial, the State notified appellant of its intent to present evidence of

3

"multiple inappropriate and sexual" text messages that he had sent to Rita. Appellant pled not guilty to all counts.

At trial, Rita testified that beginning in April 2012, appellant had touched her inappropriately and had made her touch him inappropriately. Specifically, she testified that the touching had first occurred over clothes and that later, on five occasions, she and appellant had sexual intercourse. Rita testified that she was scared while having sex with appellant and that the sex had hurt her. The State introduced evidence of text-message exchanges between appellant and Mother and between appellant and Rita. These exchanges appeared to corroborate Rita's testimony about appellant's sexual relationship with her.

After the parties finished presenting evidence and arguments, a jury convicted appellant of all five counts. The trial court set his sentences at forty years on each count, running concurrently.[4] Appellant brought this appeal.

## Admissibility of Cell-Phone Extractions

In his first point, appellant argues that the trial court erred by admitting printouts from the extractions of Mother's and Rita's cell phones without receiving evidence that established the reliability of the scientific theory underlying the extraction device, proof that the particular devices at issue were working correctly on the date they were used, and the qualifications and competency of the devices' operators. We review a trial court's admission of evidence over a

---

[4]During the punishment phase, the State presented evidence of appellant's prior crimes, including murder.

4

defendant's objection for an abuse of discretion. *Sanders v. State*, 422 S.W.3d 809, 812 (Tex. App.—Fort Worth 2014, pet. ref'd). An abuse of discretion occurs when a trial court's decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *Id.* at 812–13.

Near the beginning of the trial, outside of the presence of the jury, the trial court held an evidentiary hearing on the admissibility of records from the extraction of Mother's cell phone. Shawn Dority, a detective with the Lewisville Police Department (LPD), testified that he performs approximately two cell phone extractions per month, had been doing so for about a year and a half, and had received training in extractions through a twenty-hour course. He testified that he had extracted Mother's cell phone in August 2012 by connecting the phone to a "piece of computer equipment that [took] the data on the cell phone and copie[d] it over to another location."

Specifically, Detective Dority testified that the LPD uses a "UFED Cellebrite" device to extract data from cell phones. This device comes with "a large amount of different cables for each . . . kind of cell phone," and the person extracting data selects the model of phone on a list after connecting the device. Detective Dority explained that he knew the phone in question had been successfully extracted because the UFED Cellebrite stated that extraction had occurred and output a report to a memory stick. He also testified that the UFED Cellebrite does not allow a user to alter extracted information from the phone. Detective Dority identified State's Exhibit 1—a printout of text messages

5

exchanged between two phone numbers—as the data extracted from Mother's phone. On cross-examination, Detective Dority admitted that he did not know what the letters in "UFED" represented, that he did not know technological details about how the UFED or cell phones worked, that the UFED and cell phone in question had not been tested on the day of the extraction to determine that they were working properly, and that there was no way to conclusively determine that any particular person sent a text message from a cell phone number that appeared on the report.

After Detective Dority's testimony concluded, appellant objected to the admission of State's Exhibit 1. He compared the cell-phone extraction device to an Intoxilyzer and stated,

> [I]n order to introduce those results, they've, one, got to prove the machine functioned properly on the day of the test as evidenced by running a reference sample through the machine. And that wasn't done here.

> They have to have existence of periodic supervision over the machine and operation by somebody who understands the scientific theory of the machine, which they don't have here.

> They have to have proof [of] the results of the test by a witness . . . qualified to translate or interpret such results so as to eliminate hearsay.

> In addition to that, unlike the [I]intoxilyzer where you're interpreting the results of alcohol based on the machine's interpretation, here you have . . . hearsay based on hearsay based on hearsay in that what they're attempting to do is extract information . . . from a telephone that they don't know whether it's working properly for numbers that they don't know who they really belong to or be able to show that it came from that person.

6

The trial court overruled appellant's objection on the condition that before presenting the exhibit showing the text messages to the jury, the State "tie[d] [it] up" by having Mother corroborate details regarding the messages.

In front of the jury, Detective Dority testified that through the UFED Cellebrite, he extracted information, including text messages, from a certain cell phone and generated a printout containing that information. Appellant renewed his objections to the admission of State's Exhibit 1, but the trial court overruled them and admitted the exhibit for record purposes only.

During Mother's testimony, she confirmed that State's Exhibit 1A, a selection of some pages from State's Exhibit 1, comprised "[t]ext messages between [appellant] and [her]self." She told the jury what her and appellant's cell phone numbers were and stated that the messages in State's Exhibit 1A were a fair representation of exchanges between her and appellant. Later, Mother again identified the items on State's Exhibit 1A as text messages that came off of the cell phone that she had given to the police.

Similarly, outside of the presence of the jury, Eric Beckwith, an investigator with the Denton Police Department, testified that he had received in-house training on using a Cellebrite UFED, that he had been using the device for at least two years and had extracted at least fifty phones, and that he had extracted Rita's cell phone. Appellant objected to the admission of a document produced from that extraction on similar grounds to his objection to the admission of State's

Exhibit 1.[5] The trial court overruled the objection and admitted State's Exhibit 4 for all purposes. At the time that the court did so, Rita had already identified State's Exhibit 4 as containing accurate transcriptions of text–message exchanges between her and appellant. In front of the jury, Officer Beckwith testified about the extraction, identified State's Exhibit 4 as the chronological report generated by the extraction, and read some of the text-message exchanges on the exhibit.

On appeal, citing *Kelly v. State*, appellant contends that the cell-phone extractions comprised novel scientific evidence that required a finding of reliability and relevance before admission. *See* 824 S.W.2d 568, 573–74 (Tex. Crim. App. 1992) (deciding the admissibility of inculpating DNA evidence). He argues that the trial court did not hold a "gate keeping" hearing and that officers Dority and Beckwith did not have sufficient knowledge of the devices to establish that they produced reliable results. Also, citing *Harrell v. State*, appellant contends that there was "no showing that anyone with technical expertise maintained the UFED [devices] . . . or that [they were] functioning properly on the day [they were] used." *See* 725 S.W.2d 208, 209–13 (Tex. Crim. App. 1986) (analyzing whether part of a breath-test machine was properly certified as required by regulations in the administrative code and whether results from the

_____

[5]Later, in the punishment phase of the trial, appellant conceded that these exhibits correctly depicted text-message conversations between him and Mother and between him and Rita.

8

machine were admissible). Appellant also compares this case to *Hernandez v. State*, in which the court of criminal appeals analyzed the admissibility of drug-test results that were sponsored by a witness who had used a urinalysis machine but did not provide testimony about the machine's scientific reliability. 116 S.W.3d 26, 29–31 (Tex. Crim. App. 2003).

The types of evidence in the cases appellant cites differ from the evidence at issue here. Those cases involved testimony about the collection, analysis, and incriminating effects of biological evidence (urine, blood, semen, and breath) that was not amenable to precise independent corroboration or confirmation by untrained lay witnesses or proper application by an untrained judge or jury without supporting expert testimony. *See id.* at 27–28 (indicating that the result from a urinalysis machine was the sole reason supporting the revocation of a defendant's community supervision); *Kelly*, 824 S.W.2d at 569–71, 574 (establishing that expert testimony explained the uniqueness of each person's DNA along with DNA extraction and comparison techniques).

To be sure, the requirements of relevancy and reliability for the admission of scientific evidence apply to more types of evidence than the biological evidence at issue in *Hernandez* and *Kelly*. *See, e.g., Krause v. State*, 243 S.W.3d 95, 108–10 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Williford v. State*, 127 S.W.3d 309, 312 (Tex. App.—Eastland 2004, pet. ref'd) (applying the *Kelly* requirements for the reliability of scientific evidence to testimony about data copied from a computer's hard drive). But those requirements arise from the

9

principle that "[s]cientific evidence has the ability to mislead a jury that is not properly equipped to judge the probative force of the evidence." *Layton v. State*, 280 S.W.3d 235, 241 (Tex. Crim. App. 2009). Thus, under rule of evidence 702, "it is the responsibility of the trial court to determine whether the scientific evidence offered is sufficiently reliable, as well as relevant, *to help the jury in reaching accurate results*." *See id.* (emphasis added); *see also* Tex. R. Evid. 702. This places the trial court "in the role of a 'gatekeeper,' whose responsibility it is to weed out inadmissible evidence based on a lack of reliability." *Layton*, 280 S.W.3d at 241; *see Somers v. State*, 368 S.W.3d 528, 535 (Tex. Crim. App. 2012) ("The threshold determination in an inquiry into the admissibility of scientific evidence is whether the evidence is helpful to the trier of fact, and for such evidence to be helpful, it must be reliable."); *Coleman v. State*, 440 S.W.3d 218, 226 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("[T]he party offering scientific expert testimony must demonstrate, by clear and convincing evidence, that this testimony is sufficiently reliable and relevant to assist the factfinder in reaching accurate results.").

Applying the controlling principle of reliability to the particular circumstances of this case,[6] we cannot hold that the trial court abused its

---

[6]We do not opine about the general reliability of cell-phone extractions, on the particular reliability of an extraction obtained through a UFED Cellebrite, or on the type or extent of testimony required for admission of cell-phone extraction reports when they are not independently corroborated by the owner or possessor of the cell phone in question.

discretion by admitting the cell-phone extraction reports because the combination of the officers' testimony with Mother's and Rita's uncontroverted testimony empirically showed that the extractions accurately copied and displayed text-message exchanges from Mother's and Rita's phones. Before the trial court admitted State's Exhibit 1A, Detective Dority testified that he had received training in cell-phone extractions and had completed many extractions, that he had used the UFED Cellebrite to extract text messages in this case, and that he knew the extraction was successful because of information produced by the UFED Cellebrite. Mother then confirmed that State's Exhibit 1A—comprising a small part of the lengthy extraction report—matched text-message exchanges between her and appellant that were taken from her cell phone. This testimony, taken together, confirmed that the UFED Cellebrite worked correctly and produced reliable results when Detective Dority used it. Similarly, Officer Beckwith's and Rita's testimony, taken together, establish that the UFED Cellebrite accurately produced the text-message exchanges between appellant and Rita that the State presented to the jury.

Because the trial court did not abuse its discretion by implicitly finding that the extraction devices reliably copied the information from Rita's and Mother's cell phones and by therefore admitting the printouts from the cell-phone extractions, we overrule appellant's first point. *See Sanders*, 422 S.W.3d at 812; *see also United States v. Marsh*, 568 Fed. Appx. 15, 16–17 (2d Cir.) (holding that a trial court did not abuse its discretion by admitting an officer's testimony about

11

cell-phone extractions through a UFED Cellebrite when the officer "confirmed the results by checking the messages on the phone itself"), *cert. denied*, 135 S. Ct. 111 (2014); *Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006) (stating that the reliability inquiry is "flexible" and may sometimes depend on personal knowledge rather than scientific expertise).

## Chain of Custody

In his second point, appellant contends that the trial court erred by admitting results from testing of urine for chlamydia because the State allegedly failed to prove a proper chain of custody of the urine. LPD Detective Richard Anders testified that appellant consented to give a urine sample. Detective Anders also testified that he took appellant from a county jail to a lab to complete the test. According to Detective Anders, after appellant drank several cups of water, he urinated into a cup, and a staff member at the lab put a lid on the cup, labeled it, and left the room with it.

Amy Clark, a medical assistant, testified that she prepared appellant's urine to be tested. Specifically, she testified that a urine sample that was labeled with appellant's name was in the lab when she came back to the office from her lunch break. Clark stated that there were no other samples of urine nearby for which appellant's sample could have been mistaken. She explained that she put part of the urine sample into a different container that was also labeled with appellant's information; sealed the container; placed the container, along with a

requisition form, in a bag for later collection by LabCorp; and discarded the rest of the urine.

Clark also testified that inmates are brought to the office at a time when other patients are not there and that any other urine samples that could have been given on the day of appellant's sample had already been processed and were "out of the way."[7] She admitted, however, that she did not know who initially collected the urine sample bearing appellant's label. Clark explained that samples of urine collected in the office are labeled, sealed, and picked up by LabCorp, which tests the samples. Mark Spade, who works for LabCorp, testified that the sample bearing appellant's label tested positive for chlamydia.

When the State sought to admit its Exhibit 9—a lab requisition form concerning appellant's test for chlamydia—appellant objected on the ground that the State had not adequately proved chain of custody of the urine sample. He contended, "[W]e have no way to show exactly that it was his urine because we don't even know who took it." The trial court overruled appellant's objection. Then, during Spade's testimony, the trial court admitted, over appellant's objection, a document showing the positive result of the urine test for chlamydia.[8]

---

[7]Another witness testified that while appellant's urine was collected after noon on the day he came to the office, the most recent previous collection of urine in the office occurred at 9 a.m.

[8]While appellant's urine tested positive for chlamydia, a urethral swab tested negative. Rita also tested positive for chlamydia. She testified that she got chlamydia from appellant and that she had never had sex with anyone else when she got it.

13

Citing only one case,[9] appellant argues that the "combined testimony of the lab employees is not enough to show the proper chain of custody of appellant's urine." Proof of chain of custody authenticates evidence under rule of evidence 901(a). *See* Tex. R. Evid. 901(a); *Druery v. State*, 225 S.W.3d 491, 503 & n.30 (Tex. Crim. App.), *cert. denied*, 552 U.S. 1028 (2007)). We have explained that proof that validates the beginning and the end of a chain of custody

> will support the admission of evidence, barring any evidence of tampering or alteration. Without evidence of tampering or commingling, gaps or theoretical breaches in the chain of custody go to the weight of the evidence, not its admissibility. Additionally, a mere showing of the opportunity for tampering or commingling, absent affirmative evidence of such, is not sufficient to require exclusion of the evidence.

*Patel v. State*, No. 02-08-00032-CR, 2009 WL 1425219, at *2 (Tex. App.—Fort Worth May 21, 2009, no pet.) (mem. op., not designated for publication) (citations omitted); *see Druery*, 225 S.W.3d at 503–04 ("Absent evidence of tampering or other fraud, . . . problems in the chain of custody do not affect the admissibility of the evidence. Instead, such problems affect the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties." (footnote omitted)); *McGregor v. State*, 394 S.W.3d 90, 125 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("Any gaps and minor theoretical breaches go to the

---

[9]*Rodriguez v. State*, 2 S.W.3d 744, 746–48 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (analyzing the sufficiency, rather than the admissibility, of urinalysis evidence).

14

weight rather than the admissibility of the evidence, absent a showing of tampering.").

Appellant does not assert that the urine sample that tested positive for chlamydia was tampered with; he argues only that the evidence does not sufficiently establish an intermediate link in the chain of custody between the staff member's collection of the cup that appellant urinated in and Clark's handling of the specimen. But Detective Anders testified that he was present when appellant urinated and that he saw a staff member label, seal, and take the cup containing the urine, and Spade testified that he tested a urine sample that purported to connect to appellant.

Because we conclude that the evidence sufficiently establishes the beginning and end of the chain of custody of appellant's urine sample and that there is no affirmative evidence of tampering or alteration, we hold that the trial court did not abuse its discretion by admitting results of the urinalysis. *See Patel*, 2009 WL 1425219, at *2–3; *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd). We overrule appellant's second point.

## Conclusion

Having overruled appellant's points, we affirm the trial court's judgment.

/s/ Terre Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 5, 2015

16